## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **EDWARD S. PHILLIPS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:24-cv-467-DWD** |
| | ) | |
| **ANTHONY WILLS, Warden, Menard Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### <u>MEMORANDUM & ORDER</u>

**DUGAN, District Judge:**

Petitioner, an inmate at Menard Correctional Center, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a Motion to Dismiss that Petition under 28 U.S.C. § 2244(d), to which Petitioner has filed a Response in Opposition. (Docs. 10 & 13). As explained below, the Motion to Dismiss is **GRANTED**.

### I. BACKGROUND

On April 13, 2007, Petitioner was convicted by a jury in the Circuit Court of St. Clair County, Illinois, of first-degree murder under 720 ILCS 5/9-1(a)(1). (Doc. 1, pg. 2). He was sentenced to a term of 55 years of imprisonment on May 29, 2007. (Doc. 1, pg. 2).

Petitioner directly appealed the judgment of conviction to the Illinois Appellate Court, Fifth District, alleging speedy trial violations, delays in his initial appearance, a failure to provide funds for expert witnesses and for investigative services, a failure to grant a motion for a bill of particulars and motion for additional discovery, an erroneous denial of a motion to suppress a videotaped statement, a violation of an order *in limine*,

erroneous videotaped testimony, an erroneous grant of a motion *in limine*, inappropriate contact between jurors and court personnel during deliberations, a failure to redact a videotaped statement to the police, a failure to present transcripts to the jury, a prejudicial statement during *voir dire* that the case was "high profile," a violation of the statutory right to a DNA database search, and a failure to prove guilt beyond a reasonable doubt. (Doc. 1, pg. 3). On December 2, 2011, the judgment of conviction was affirmed by that court. *See People v. Phillips*, 2011 IL App (5th) 070416-U; (Doc. 1, pg. 3). Petitioner filed a petition for leave to appeal to the Supreme Court of Illinois, which was denied on May 30, 2012. *See People v. Phillips*, 968 N.E.2d 1070 (2012); (Doc. 1, pgs. 3-4).

On October 10, 2012, Petitioner filed a *pro se* petition for relief from judgment under 735 ILCS 5/2-1401(f), alleging speedy trial violations, a failure to provide funds for expert witnesses and for investigative services, a failure to redact a videotaped statement to the police, an erroneous denial of a motion for mistrial, a denial of the right to cross-examination, and inappropriate contact between jurors and court personnel during deliberations. (Doc. 1, pg. 4). This petition was dismissed on May 28, 2014. (Doc. 1, pg. 4).

Petitioner filed a postconviction petition under 725 ILCS 5/122-1 *et seq.* on February 27, 2013. (Doc. 1, pgs. 4-5). He alleged the ineffective assistance of trial and appellate counsel due to, *inter alia*, a failure to assert a marital privilege, violations of an order *in limine*, a failure to test evidence, a failure to investigate and present impeachment evidence, and a denial of due process from a failure to disclose *Brady* evidence. (Doc. 1, pg. 5). That postconviction petition was dismissed on June 7, 2018. (Doc. 1, pg. 6).

2

On August 26, 2013, Petitioner filed a successive *pro se* petition for relief from judgment under § 2-1401(f), alleging the unlawful use of eavesdropping equipment to obtain evidence. (Doc. 1, pg. 6). Following a grant of leave to supplement, the petition was dismissed on May 28, 2014. (Doc. 1, pg. 6).

Petitioner's initial *pro se* petition for relief from judgment under § 2-1401(f) and postconviction petition under § 122-1 *et seq*. were appealed to the Illinois Appellate Court, Fifth District, and the Supreme Court of Illinois. (Doc. 1, pgs. 6-7). The dismissal of the *pro se* petition for relief from judgment under § 2-1401(f) was affirmed by the Appellate Court on February 19, 2015, and a petition for leave to appeal in the Supreme Court of Illinois was denied on May 27, 2015. *See People v. Phillips*, 2015 IL App (5th) 140281-U; *People v. Phillips*, 32 N.E. 3d 677 (2015); (Doc. 1, pgs. 6-7). The dismissal of the postconviction petition under § 122-1 *et seq*. was affirmed by the Appellate Court, as modified upon the denial of rehearing, on October 7, 2022, and a petition for leave to appeal to the Supreme Court of Illinois was denied on January 25, 2023. *See People v. Phillips*, 2022 IL App (5th) 180348-U; *People v. Phillips*, 201 N.E. 3d 595 (2023); (Doc. 1, pg. 7). Petitioner did not appeal the Circuit Court of St. Clair County's dismissal of his successive *pro se* petition for relief from judgment under § 2-1401(f). (Doc. 1, pg. 7).

In the Petition filed with this Court, Petitioner alleges three grounds for relief. First, Petitioner alleges the ineffective assistance of trial counsel related to the failure to assert a marital privilege at trial. (Doc. 1, pgs. 8-20). Second, Petitioner alleges a *Brady* violation due to the prosecution's failure to disclose certain evidence and the ineffective assistance of counsel related to a failure to request that evidence. (Doc. 1, pgs. 22-24).

3

Third, Petitioner alleges the ineffective assistance of trial counsel in relation to the failure to request that Petitioner's videotaped interview be redacted. (Doc. 1, pgs. 25-27). Petitioner states the first two grounds for relief were presented to the Illinois Appellate Court, Fifth District, and the Supreme Court of Illinois in postconviction petitions. (Doc. 1, pgs. 21, 25). As to the third ground for relief, however, Petitioner suggests the issue was not presented on direct appeal or in a postconviction petition to both the Illinois Appellate Court, Fifth District, and the Supreme Court of Illinois. (Doc. 1, pgs. 27-28).

Respondent filed a Motion to Dismiss the Petition under § 2244(d). Petitioner, who is represented by counsel in this action, filed a Response in Opposition to that Motion to Dismiss. (Docs. 10 & 13). As such, the matter is now ripe for a resolution by the Court.

## II. ANALYSIS

In the Motion to Dismiss, Respondent notes Petitioner certified that the Petition was placed in the prison mailing system on January 12, 2024. (Docs. 1, pg. 30; 10, pg. 4). Petitioner's counsel signed the Petition below that certification. (Doc. 1, pg. 30). However, Respondent further notes the Petition was not actually filed by Petitioner's counsel, with a signed Civil Cover Sheet, until February 20, 2024. (Docs. 1; 1-1; 10, pg. 4).

According to Respondent, the Petition is untimely by virtue of its filing on February 20, 2024. (Doc. 10, pg. 4). He argues, unless the Petition turns on newly discovered facts, a newly recognized constitutional right, or a State-created impediment to filing, it was subject to a one-year limitations period that began to run when Petitioner's judgment of conviction became final on direct review and that was tolled only during the pendency of the State's collateral review. (Doc. 10, pg. 4). In this case, Respondent

suggests the one-year limitations period began to run on August 28, 2012, which was "ninety days after the Illinois Supreme Court denied his PLA on direct review[] when the time to petition for certiorari lapsed." (Doc. 10, pg. 5). The one-year limitations period allegedly ran for 182 days, at which point Petitioner filed an initial postconviction petition on February 27, 2013. (Doc. 10, pg. 5). The one-year limitations period was allegedly tolled through January 25, 2023, when the Supreme Court of Illinois denied Petitioner's petition for leave to appeal on the postconviction petition. (Doc. 10, pg. 5). Respondent argues the one-year limitations period then ran, uninterrupted, for 183 days until its lapse on July 28, 2023. (Doc. 10, pgs. 5-6). Respondent argues Petitioner, rather than file the Petition on that date, waited until February 20, 2024, which was 207 days later. (Doc. 10, pg. 6).

Respondent stresses that the Petition does not turn on newly discovered facts, a newly recognized constitutional right, or a State-created impediment to filing. (Doc. 10, pg. 5). While Petitioner suggests he did not learn of the *Brady* material until January 2015, Respondent argues that is belied by the record. (Doc. 10, pg. 5). Respondent explains, "[t]he materials at issue are recordings petitioner himself made of voicemails…received on his personal phone, [citation], so he was necessarily aware of them from the time of their creation." (Doc. 10, pg. 5). Since police officers seized those recordings pursuant to a search of Petitioner's car before trial, and Petitioner informed his trial counsel that the police officers possessed the recordings, Respondent argues Petitioner knew of the facts underlying the alleged *Brady* violation before the judgment of conviction became final. (Doc. 10, pg. 5). As such, Respondent argues "no later start date applies." (Doc. 10, pg. 5).

Similarly, Respondent argues "Petitioner's initial 2-1401 petition did not toll the limitations period because the state appellate court held that the petition was untimely, [citations], and thus, it was not 'properly filed.' " (Doc. 10, pg. 6). Respondent emphasizes, though, "even if the untimely state filing did toll—and thus the limitations period was tolled for the entire period from when petitioner's conviction became final until his postconviction proceedings concluded on January 25, 2023—petitioner's federal habeas petition would have been due January 25, 2024, almost a month before his attorney filed it in February 2024." (Doc. 10, pg. 6 n. 4). Finally, the remaining state petitions, in Respondents view, are "irrelevant to the timeliness calculation because the entirety of their pendency are encompassed by the period in which the limitations period was already tolled by petitioner's initial postconviction petition." (Doc. 10, pg. 6).

In Response, Petitioner concedes that the Petition is untimely by arguing the one-year limitations period should be equitably tolled "to and including the actual filing date of February 20, 2024." (Docs. 13, pgs. 1, 4; 13-1, generally). As to the diligence in pursuing his rights, Petitioner argues the record and procedural history of the case show he "has been more than reasonable." (Doc. 13, pg. 2). Specifically, Petitioner notes he timely filed a direct appeal from the judgment of conviction followed by a petition for relief from judgment under section 2-1401 and the initial post-conviction petition. (Doc. 13, pg. 2).

Moreover, Petitioner argues he "began corresponding with counsel about preparing and filing a federal habeas petition almost immediately after the Illinois Supreme Court denied his petition for leave to appeal the denial of his initial post-conviction petition on January 25, 2023, raising concerns about the applicable statute of

6

limitations." (Doc. 13, pg. 2) (Emphasis in original omitted.). While arguing an attorney's failure to satisfy professional standards of care may constitute extraordinary circumstances for purposes of an equitable tolling, Petitioner further explains:

> The "extraordinary circumstance" that stood in [Petitioner's] way was an egregious error, committed by the undersigned counsel, in both calculating the limitations deadline imposed by § 2244(d), and in affirmatively misinforming him about the deadline. Counsel erroneously informed Mr. Phillips that the deadline for filing his petition was April 24, 2024.
>
> …
>
> Here, there was more than just a "garden variety claim of excusable neglect." As explained in the declaration, counsel's error in miscalculating the filing deadline was compounded by his affirmative act of misinforming Mr. Phillips and persuading him that his prior understanding of the deadline was incorrect—when, in fact, it was Mr. Phillips who correctly understood how to calculate the limitations period correctly, and counsel who was in error. [Citation.] But for counsel's error, [Petitioner] would have timely filed his petition, or at least a version of his petition (which, if incomplete, could have been amended). Counsel's error effectively deprived [Petitioner] of his opportunity to file his petition in a timely manner and gave respondent grounds to seek dismissal of the petition as untimely.

(Doc. 13, pgs. 3-4) (Emphasis in original omitted.).

Habeas counsel's Declaration supports these assertions. (Docs. 13, pgs. 2-4; 13-1).[1]

Alternatively, Petitioner argues he can overcome procedural barriers to a review based on new evidence of actual innocence, as it is more likely than not that no reasonable

---

[1] Petitioner's counsel also notes, "[s]ince [Petitioner] is raising an issue of ineffective assistance of his habeas counsel, this raises a related concern that his claim and argument for equitable tolling may be compromised by a conflict of interest and raises the issue of whether counsel can continue to represent him." (Doc. 13, pgs. 4-5) (Emphasis in original omitted.). However, since "expectations can be exceeded" and "there does not appear to be any absolute bar to an attorney arguing his own incompetence or ineffectiveness as to a particular issue," Petitioner's habeas counsel "has elected to do so here." (Doc. 13, pg. 5). Accordingly, Petitioner waives any conflict of interest. (Docs. 13, pg. 5; 13-2).

juror would have convicted him in light of the new evidence. (Doc. 13, pgs. 5-6). He notes

"the evidence at trial was very closely balanced," so the new evidence, *i.e.*, his February

21, 2013, affidavit from the Illinois postconviction proceedings and an "additional

recording of a voice mail message by [Petitioner's ex-wife] to [Petitioner] that was made

and recorded after the one played at trial," makes the difference in this case. (Doc. 13,

pgs. 7-9; 13-3) (Emphasis in original omitted.). The additional recording, which forms the

basis for Petitioner's *Brady* claim, allegedly "would have completely undermined [his ex-

wife]'s testimony—including her denial that it was her voice on the first voice-mail

recording, her claim that she had only threatened to tell the divorce court, and not the

police, about [Petitioner] being at the scene of the murder, and her evasion of the question

as to whether she had sought to blackmail [Petitioner]." (Doc. 13, pg. 10). In short, the

additional recording allegedly "would have exposed [Petitioner's ex-wife] as someone

willing to lie in order to convict" him. (Doc. 13, pg. 10) (Emphasis in original omitted.).

Now, § 2241(d) provides:

(d)(1) A 1-year period of limitation shall apply to an application for a writ
of habeas corpus by a person in custody pursuant to the judgment of a State
court. The limitation period shall run from the latest of—

> (A) the date on which the judgment became final by the conclusion
> of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created
> by State action in violation of the Constitution or laws of the United
> States is removed, if the applicant was prevented from filing by such
> State action;

> (C) the date on which the constitutional right asserted was initially
> recognized by the Supreme Court, if the right has been newly

recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

This one-year limitations period may be equitably tolled. *See Conner v. Reagle*, 82 F.4th 542, 550 (7th Cir. 2023) (citing *Holland v. Florida*, 560 U.S. 631, 648-49 (2010)). However, Petitioner faces a "very high" threshold for obtaining an equitable tolling of that period. *Lombardo v. U.S.*, 860 F.3d 547, 551 (7th Cir. 2017) (quoting *U.S. v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000)). Such relief is "reserved for the exceptional case"; therefore, it is only rarely or sparingly granted. *Conner*, 82 F.4th at 550 (citing *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016)); *Lombardo*, 860 F.3d at 553 (quoting *Robinson v. U.S.*, 416 F.3d 645, 650 n. 1 (7th Cir. 2005)). Petitioner must show (1) he pursued his rights diligently, and (2) extraordinary circumstances barred the filing of a timely petition. *Conner*, 82 F.4th at 550 (citing *Holland*, 560 U.S. at 648-49); *Boulb v. U.S.*, 818 F.3d 334, 339-40 (7th Cir. 2016)). Extraordinary circumstances exist only if "an 'external obstacle' beyond the party's control 'stood in [its] way' and caused the delay." *Lombardo*, 860 F.3d at 552 (quoting *Menominee India Tribe of Wisconsin v. U.S.*, 577 U.S. 250, 256 (2016)); *see also Moreland v. Eplett*, 18 F.4th 261, 271 (7th Cir. 2021) (" '[G]arden variety' claims are insufficient."). The inquiry, which requires an application of "flexible standards on a case-

by-base basis," is "highly fact dependent." *Socha v. Boughton*, 763 F.3d 674, 683-84, 688
(7th Cir. 2014); *accord Isom v. Neal*, 574 F. Supp. 3d 598, 607 (N.D. Ind. 2021).

However, neither a lack of familiarity with the law nor ignorance of legal
procedures, even by habeas counsel, is an extraordinary circumstance that justifies an
equitable tolling. *Pigram v. Williams*, 182 F. Supp. 3d 861, 864 (N.D. Ill. 2016) (quoting
*Taylor v. Michael*, 724 F.3d 806, 811 (7th Cir. 2013)); *Arrieta v. Battaglia*, 461 F.3d 861, 867
(7th Cir. 2006) (citing *Williams v. Sims*, 390 F.3d 958, 963 (7th Cir. 2004)). Recently, in the
context of §§ 2244(d) and 2254, the Seventh Circuit explained as follows:

> To qualify as extraordinary, the circumstance that prevented the petitioner
> complying with a deadline must have been an external obstacle that
> impeded the presentation of his claim to the court, [citations], in other
> words, something that was beyond his control, [citations]. Negligence on
> the part of the petitioner's counsel, including counsel's ignorance or
> miscalculation of a deadline or the failure to do sufficient legal research to
> ascertain the deadline, is ordinarily an insufficient basis in and of itself
> for equitable tolling, as it is not an external obstacle.

*Conner*, 82 F.4th at 551 (citing *Menominee India Tribe of Wisc.*, 577 U.S. at 256-57; *Lombardo*,
860 F.3d at 552; *Carpenter*, 840 F.3d at 872; *Holland*, 560 U.S. at 651-52; *Moreland*, 18 F.4th
at 271; *Ademiju v. U.S.*, 999 F.3d 474, 477 (7th Cir. 2021)) (Emphasis in original omitted).

Here, based on these legal authorities, Petitioner is clearly not entitled to an
equitable tolling of the one-year limitations period stated in § 2244(d). This is true even if
habeas counsel can be blamed for misunderstanding or negligently miscalculating, and
erroneously advising Petitioner on, that limitations period. *See Conner*, 82 F.4th at 551;
*Pigram*, 182 F. Supp. 3d at 864; *Arrieta*, 461 F.3d at 867. Put another way, even if Petitioner
diligently pursued his rights, the Court cannot conclude an extraordinary circumstance,

*i.e.*, an external obstacle beyond his control, barred him from timely filing the Petition. *See Conner*, 82 F.4th at 550; *Lombardo*, 860 F.3d at 552; *Moreland*, 18 F.4th at 271. Under the circumstances of this case, Petitioner is bound by the acts of habeas counsel. *See Conner*, 82 F.4th at 551-52; *Lombardo*, 860 F.3d at 552 (citing *Maples v. Thomas*, 565 U.S. 266, 280-82 (2012); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92 (1990); *Johnson v. McBride*, 381 F.3d 587, 589-90 (7th Cir. 2004); *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)).

Critically, the Supreme Court, the Seventh Circuit, and other courts within the Seventh Circuit have reached this conclusion in various similar cases. *See, e.g., Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007) ("Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel."); *Conner*, 82 F.4th at 551-52 (Seventh Circuit noting, as a factual matter, it could "appreciate that [the petitioner] was the victim of bad advice from his postconviction counsel," but, as a legal matter, the petitioner "[wa]s charged with the acts and omissions of his counsel, including his counsel's mistakes"); *Lombardo*, 860 F.3d at 552 (noting the Supreme Court, the Seventh Circuit, and other courts "have consistently held[] mistakes or miscalculations of that sort by a party's attorney," *i.e.*, a mistaken belief as to the running of the statute of limitations, "do not satisfy the extraordinary circumstances element for equitable tolling."); *Socha*, 763 F.3d at 685 ("Poor representation by an attorney calls for a more nuanced appraisal. Defects in performance, whether through the attorney's own fault or attributable to extenuating circumstances, do not inevitably support equitable tolling, but they are relevant. The Supreme Court has identified some types of errors (such as miscalculation of a deadline) that do not warrant

relief; it calls them 'garden variety' claims of excusable neglect, meaning that these errors are too common to be called 'extraordinary.' "); *Obriecht v. Foster*, 727 F.3d 744, 749 (7th Cir. 2013) ("As our precedents make clear, an attorney's misunderstanding or miscalculation of the AEDPA deadline alone does not constitute an extraordinary circumstance."); *Griffith v. Rednour*, 614 F.3d 328, 331 (7th Cir. 2010) ("[A] lawyer's 'egregious behavior' [citation] satisfies th[e] [extraordinary circumstances] standard, though neither 'a garden variety claim of excusable neglect' nor a 'miscalculation' about the time available for filing is an 'extraordinary' circumstance…. The most one could say is that [the petitioner's] lawyer misunderstood how to determine when a state petition is 'pending' for the purpose of § 2244(d)(2). That sort of error is not 'extraordinary'; it is all too common. *Holland* tells us that a simple legal mistake does not excuse an untimely filing. It may be negligent to wait until what is by a lawyer's own calculation the last possible day, because such a calculation could be wrong. But this kind of negligence is not 'extraordinary' by any means. Such a blunder does not extend the time for filing a collateral attack."); *Robinson*, 416 F.3d at 650 n. 1 ("Equitable tolling is granted sparingly, where extraordinary circumstances beyond the litigant's control prevented timely filing; a mistaken understanding about the deadline for filing is not grounds for equitable tolling."); *Powell v. Davis*, 415 F.3d 727 (7th Cir. 2005) (" '[A]ttorney misconduct, whether labeled negligent, grossly negligent, or willful, is attributable to the client' and thus is not a circumstance beyond a petitioner's control that might excuse an untimely petition."); *Modrowski v. Mote*, 322 F.3d 965, 968 (7th Cir. 2003) ("We will not revisit our long-standing determination that petitioners bear ultimate responsibility for their filings, even if that

means preparing duplicative petitions: petitioners, 'whether in prison or not, must
vigilantly oversee the actions of their attorneys and, if necessary, take matters into their
own hands.' "); *Pigram*, 182 F. Supp. 3d at 864 ("Missing a filing deadline…does not
constitute an impediment that is beyond the litigant's control, even if the mistake is
attributable to attorney incompetence."); *Consumers Health Info. Corp. v. Amylin Pharms.,
Inc.*, 54 F. Supp. 3d 1001, 1011 (S.D. Ind. 2014) ("The Seventh Circuit has expressly rejected
attempts by a party to invoke its own attorney's misconduct and/or negligence as a basis
for equitable tolling, finding that attorney conduct is attributable to the client.").

In reaching its conclusion, the Court stresses that, contrary to Petitioner's
assertions, the circumstances suggested by *Holland* are not present in this case. Habeas
counsel's misunderstanding or negligent miscalculation of the one-year limitations
period contained in § 2244(d) may have resulted in a mistake and erroneous advice, when
acting on Petitioner's behalf, but he in no way engaged in egregious behavior that, *e.g.*,
reflects an abandonment of his legal representation of Petitioner. *See Holland*, 560 U.S. at
652-54; *Maples*, 565 U.S. at 282; *Conner*, 82 F.4th at 552; *Schmid v. McCauley*, 825 F.3d 348,
350 (2016); *Obriecht*, 727 F.3d at 749-50; *Griffith*, 614 F.3d at 331; (Doc. 13-1).

Apart from this conclusion under § 2244(d), Petitioner is not necessarily barred
from proceeding on the Petition. There is a narrow actual innocence gateway through
which a petitioner may pass to obtain a review of a time-barred petition. *See Patterson v.
Adkins*, 124 F.4th 1035, 1046 (7th Cir. 2025); *Gladney v. Pollard*, 799 F.3d 889, 896 (7th Cir.

2015).[2] To pass through that gateway, Petitioner must provide reliable new evidence—*i.e.*, exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at the trial—that shows it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Id.* (quoting *House v. Bell*, 547 U.S. 518, 536–37 (2006); *Schlup v. Delo*, 513 U.S. 298, 324 (1995)); *Dixon*, 93 F.4th at 403; *see also Jones v. Calloway*, 642 F.3d 454, 461 (7th Cir. 2016) (" 'New evidence' in this context does not mean 'newly discovered evidence'; it just means evidence that was not presented at trial.") (Emphasis in original omitted). On the type of evidence necessary for such a showing, the Seventh Circuit has elaborated:

> As this court described it, "[t]o demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim."

*Dixon*, 93 F.4th at 403 (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)).

Notably, an "[u]nexplained delay in presenting such evidence is not an absolute bar, though it may play a role in determining whether a petitioner has proven his actual innocence: a delayed petition 'should seriously undermine the credibility of the actual-innocence claim.' " *Gladney*, 799 F.3d at 898 (quoting *McQuiggin v. Perkins*, 569 U.S. 383,

---

[2]Notably, though, an actual innocence gateway claim should not be confused with a substantive claim of actual innocence. *See Dixon v. Williams*, 93 F.4th 394, 402-03 (7th Cir. 2024); *see also Cal v. Garnett*, 991 F.3d 843, 850 (7th Cir. 2021) ("[T]he Supreme Court has never held that actual innocence claims, standing alone—separate and apart from any constitutional error—could support habeas relief."); *Lund v. U.S.*, 913 F.3d 665, 668 (7th Cir. 2019) ("Framing the exception as a gateway presupposes that a petitioner will have underlying claims separate from the claim that he is actually innocent."); *Gladney*, 799 F.3d at 895 ("[W]hen a petitioner accompanies his persuasive showing of actual innocence with a different claim for relief…actual innocence may be used as a 'gateway' to excuse procedural defaults that would otherwise bar a federal court from reaching the merits of the underlying claims."). In this case, Petitioner raises the former type of actual innocence claim. *See id.*; (Doc. 13, pgs. 5-7, 10).

399-400 (2013)). Further, during its review, the Court "consider[s] 'all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.' " *Patterson*, 124 F.4th at 1046 (quoting *House*, 547 U.S. at 538); *see also Wilson v. Cromwell*, 69 F.4th 410, 422 (7th Cir. 2023) ("[T]he presentation of new and credible evidence does not automatically satisfy the…standard for actual innocence. Instead, the new evidence must be considered along with the existing evidentiary record."). The Court then " 'make[s] "a probabilistic determination about what reasonable, properly instructed jurors would do." ' " *Patterson*, 124 F.4th at 1046 (quoting *House*, 547 U.S. at 538). It is not the Court's function to make independent factual determinations as to what likely occurred in the case; instead, the Court is only tasked with assessing the likely impact of the evidence on reasonable jurors. *Blackmon v. Williams*, 823 F.3d 1088, 1102 (7th Cir. 2016) (quoting *House*, 547 U.S. at 538). In light of these governing legal principles, it is clear that the actual innocence gateway standard is onerous and demanding, such that a review is allowed only in extraordinary cases. *Patterson*, 124 F.4th at 1046 (quoting *House*, 547 U.S. at 538); *accord Dixon*, 93 F.4th at 403. If Petitioner can prevail under that standard, though, the Court can consider the Petition despite its tardiness. *See Arnold v. Dittmann*, 901 F.3d 830, 842 (7th Cir. 2018).

Here, the Court has reviewed all the available evidence. *See Phillips*, 2011 IL App (5th) 070416-U, ¶¶ 7-96; *accord Phillips*, 2022 IL App (5th) 180348-U, ¶¶ 6-125; (Docs. 1,

pgs. 8-20; 13, pgs. 7-11). The following summary of the evidence, which is consistent with that of Petitioner, is taken from the Illinois Appellate Court, Fifth District:[3]

> *Kenneth and Susan Blumberg*. Kenneth and Susan were the parents of the victim, Amy Jennifer Blumberg. Amy was working in the dance store owned by her aunt and uncle on December 31, 1999, while she was home on break from her college courses at Eastern Illinois University. She was 20 years old.
>
> At about 6 p.m. on December 31, 1999, Kenneth and Susan Blumberg began receiving phone calls from her friends wondering where Amy was. Amy had plans to spend the evening with some of these friends to celebrate the new year. Susan made multiple calls trying to locate Amy without success. They assumed that Amy must have stopped off somewhere on her way home. But, after some time had passed, they became concerned and decided to drive to the store. On the way to the store, they received a call from the manager of a pizza restaurant nearby in O'Fallon. That manager, Bob Uhrig, was a dear friend to Amy. Bob sent an employee down to the store to check on Amy. That person reported that the door was not locked, that the lights were on inside the store, that Amy's car was in the parking lot, but that Amy was not inside the store. The Blumbergs arrived at the store at about 9 p.m. After entering the store, Amy's parents saw blood on the doorjamb of the entryway to the hall in the back of the store. Kenneth Blumberg encountered a "tremendous amount of blood" in the hallway. Susan Blumberg called 9–1–1 to report the finding of blood and to request an ambulance. Kenneth came back to the front part of the store and told Susan that they were "too late." They waited outside the store at the direction of the 9–1–1 operator until police arrived at the scene.
>
> *Stipulation of Maureen Blumberg*. The parties agreed to a stipulation regarding a couple of things that Maureen Blumberg, Amy's aunt, would testify to if she had testified at trial. Maureen Blumberg was a co-owner of the store. Maureen told Amy that she could close up the store at 2 p.m. The last recorded sale at the store was at 2:25 p.m. This was a cash purchase for a child's black leotard.
>
> *Andrew Whitehair*. Andrew Whitehair testified that on December 31, 1999, he was a driver for Pizza World, an O'Fallon restaurant. Andrew's manager at Pizza World, Bob Uhrig, asked him to go to the store to check on Amy.

---

[3] When reviewing this evidence, the Court notes that, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).

The time of this request was approximately 8 p.m. Andrew drove past and saw a car on the parking lot. Upon return to the Pizza World location, he called Bob and told him about the car that he saw on the parking lot. Bob confirmed that this was Amy's car and asked Andrew to return to the store to see if she was there. He returned. He exited his car and knocked on the doors to all of the businesses in the building. The store still had the lights on. Andrew tried the door, which was unlocked. He walked in. He saw nothing amiss. He called out Amy's name a couple of times with no response. He did not go further than the front part of the store. He left the store and returned to Pizza World. He called Bob again to tell him that Amy did not seem to be there, although her car was there, the lights were on, and the front door was unlocked.

*Officer John Stover.* O'Fallon officer John Stover testified at trial that he arrived at the scene shortly after 9 p.m. on December 31, 1999. Sergeant Schaefer arrived at the same time. He and Sergeant Schaefer entered the store together. The store itself looked normal. However, the officers saw a trail of blood as well as blood splattering on the floor of the hallway that was on the left side of the store behind a door. Down the hall, the first unlocked door was the door to the men's bathroom. The officers noticed a pool of blood as well as blood splattering on the floor of the bathroom. The hallway continued with a right turn where they saw the blood trail continue with additional splattering. That hallway ended at another door which led into the women's bathroom. Inside the bathroom, the officers found the body of a white female on the ground with her head lying in a large pool of blood. Officer Schaefer confirmed that the woman was dead. The officers checked an adjacent store and then left the building.

*Alva Busch.* Alva Busch, a crime scene technician, testified that he arrived at the scene of the murder at 9:35 p.m. on December 31, 1999. He testified that he saw a purse and keys on top of the counter in the store and that the cash register in the store appeared to be undisturbed. He noticed what appeared to be blood on the door frame—about one foot off of the floor—leading to the hallway. He testified about the blood in the hallway, which he believed to have been caused by someone being dragged across the carpet towards the men's bathroom. In the men's bathroom, he located a pair of nylon pants, underwear, socks, and tennis shoes. To the left of the urinal on the floor, he found a tampon. The blood trail led from the men's restroom to the women's restroom. He indicated that the victim's body was lying on the ground with her legs widely separated. The victim was nude from the waist down, with part of her bra exposed on the left side. He was not then able to determine a cause of her death. In testimony upon his recall to the stand

17

later in the State's case, Alva Busch testified about the various pieces of forensic evidence he collected in the forms of hair and fibers.

*Officer Kevin McGinnis.* Kevin McGinnis, a police officer from Mascoutah who is a member of the major case squad, was called upon to assist in the investigation of this case. He and Alva Busch went to the store to conduct their investigation on January 1, 2000. Kevin discovered what appeared to be a bullet fragment in the store next door. Looking then at the opposite wall in the store, they found a bullet hole in the wall in the front part of the store.

*Lieutenant Kurt Eversman.* Lieutenant Kurt Eversman was a St. Clair County sheriff's deputy at the time of this crime. On January 6, 2000, he was asked to examine a shell casing at the store where the crime occurred. While there, he searched for gunpowder residue on items in the store. He used an ion track vapor tracer. He found three indications of some gunpowder residue. The gunpowder residue was found on the cash register (which was the strongest alert of the three), in the hallway, and on a light switch in one of the bathrooms.

*Officer Kerry Andrews.* Officer Kerry Andrews was an O'Fallon police detective on call the evening of December 31, 1999. He videotaped the entire crime scene that night and returned to the scene the following day to do additional taping. He presented the video to the jury at trial, explaining what was on the tape.

On December 17, 2003, Detective Andrews was still a member of the O'Fallon police force. He participated in a search of the defendant's home in Mt. Sterling, Illinois, pursuant to the verbal and written consent of the defendant's ex-wife Dawn. Detective Andrews, Detective Cavins, and the defendant's ex-wife, Dawn Ritchey, were present during the search. Found at the residence was an empty gun box located in the attic above the garage. No guns were located in this search. Dawn Ritchey acknowledged that the gun box was for a .38–caliber gun that they owned.

*Raj Nanduri, M.D.* An autopsy was performed on the victim by Dr. Raj Nanduri on January 1, 2000. Dr. Nanduri testified that before conducting the examination, she was unable to tell what caused Amy's death just by visual examination. Dr. Nanduri described bruises and scrapes on various parts of her body—an impact bruise on her left knee, a pattern bruise on her left hip, a large bruise on the front of her left upper arm, and a small bruise on her right breast—all of which the doctor believed occurred before death. Amy was shot at close or intermediate range one time with the

entry wound to the back of her left ear and an exit wound in front of her right ear. In Dr. Nanduri's opinion, the bullet wound would have caused a rapid death.

*Forensic Evidence Stipulations.* The parties stipulated to various items of forensic evidence. The stipulations were read to the jury. The red substance on the carpet in front of the cash register was human blood matching Amy's DNA. Blood and debris was found on a dress on a rack in the front of the store. The substance on the hallway door frame was human blood. The defendant's finger and/or palm prints were not discovered anywhere in the store. No semen was found on the underwear found in the men's bathroom. Hairs on the nylon pants were consistent with the victim. One hair on the pants was not consistent with the defendant or with the victim. One hair on the victim's wrist was not that of the defendant or of the victim. Hair found on the victim's stomach did not belong to the victim or to the defendant. Semen was not found on any sample that was a part of the sexual assault kit collected from the victim's body. A hair collected from the victim's right ankle was consistent with the defendant's DNA profile.

*James Hall.* Forensic testimony was provided by James Hall who testified that the bullet recovered from the scene was a .38–caliber bullet with six lands and grooves with a right twist. The caliber term was explained as the diameter or size of the bullet. A .38–caliber bullet can be loaded into a different size of cartridge case—like a .38–caliber cartridge case. This particular bullet was from the .38–caliber class of bullets, and upon closer examination, James Hall testified that given the bullet's weight, design, and bearing surface, this bullet was consistent with a .38–auto–caliber bullet. He further testified that the bullet could have been fired by a Bryco Arms .38–caliber handgun, as well as by approximately 140 different weapons.

Without the actual gun used in the murder, which could be compared with the bullet fragment recovered from the crime scene, there is no forensic way to confirm that the defendant's .38–caliber Bryco Arms gun was the gun used in the crime.

*Thomas Gamboe.* Thomas Gamboe was a forensic scientist at the Illinois State Police Metro–East Forensic Science Laboratory in Fairview Heights. He provided testimony about the potential candidates for firing the projectile recovered in this case. He testified that there were 16 possible .38–caliber guns. In the .38 Special categories there were 23 possibilities. Between the .38–caliber revolvers and the .38 Special derringers, there were 49 different possibilities. When asked how many actual weapons would have been in circulation of these 49 different possibilities on December 31, 1999, Thomas

stated that it was impossible for him to say, but he guessed that the number would be in the millions of guns.

*Dennis Aubuchon.* Dennis Aubuchon was a forensic biologist at the Illinois State Police Metro–East Forensic Science Laboratory in Fairview Heights. He tested the tampon that was recovered from the crime scene. No seminal fluid was found. He did not test to determine if the blood on the tampon was menstrual blood.

*Donna Rees.* Donna Rees was a forensic scientist at the Illinois State Police Metro–East Forensic Science Laboratory in Fairview Heights. She primarily does DNA testing. She tested the string of the tampon but only found the DNA of Amy. She was not asked to see if there was any DNA evidence on the shoes or on any clothing.

*Leroy Yaeger.* Leroy Yaeger of Lebanon testified at the trial on behalf of the State. He and his daughter arrived at the On Stage store at about 12:30 p.m. on December 31, 1999. The purpose of the visit was to exchange a leotard purchased for his daughter that was too small. At 12:30 p.m., the store was closed with a sign indicating that the clerk would return after lunch. Leroy and his daughter went to lunch. Upon return to the store, the store was open. When they walked in, Leroy noticed a man, who he estimated to be in his forties, looking through the clothing racks. Leroy's daughter proceeded to try various leotards on, until she found the proper size. While doing so, Leroy spoke with Amy and learned a bit about her educational background and career plans. Leroy's daughter overheard the man ask Amy if they sold dance shoes in the store. Before they completed their purchases, the man who had been looking through the racks left the store. Leroy and his daughter left. Later that evening when he learned that Amy had been found dead in the store, he contacted the O'Fallon police, ultimately working with a sketch artist to create a likeness of the man he saw in the store. Leroy testified that the man was wearing a pair of washed-out jeans with a dark-colored jacket. He recalled that the jacket reminded him of a ski coat. He also testified that there were two vehicles in the parking lot while they were there—a black car and a maroon car. There were no pickup trucks in the parking lot.

*John Toumbs.* A man by the name of John Toumbs who lives in Mt. Sterling, Illinois, testified at trial. He owns a repair store. Prior to January 8, 1992, John purchased a .38–caliber semiautomatic pistol that was manufactured by Jennings Bryco from a gun store called Merkels in Quincy, Illinois. Sometime before January 8, 1992, John Toumbs told a few people that he wanted to sell the gun. One of the people he told was Scott Bemis. He

believes that Scott Bemis told the defendant that the gun was available. On January 8, 1992, the defendant came to his store. John testified that the defendant was an occasional customer of his store. He also knew the defendant from drag racing events, which was an interest that he and the defendant shared. The defendant said that he wanted to buy the gun. John Toumbs prepared a paper including the serial number, he confirmed that the defendant had a Firearm Owner's Identification card and included that number on the receipt, and he and the defendant both signed the sales receipt. John identified this original document, which was admitted into evidence. The gun he sold the defendant was in a blue box. On December 19, 2003, he turned the receipt over to the O'Fallon police department following a visit from an officer earlier that day. John testified that somehow he came to the police department's attention because they learned that he had owned a .38–caliber pistol at one time.

*Lieutenant Eric VanHook.* On December 17, 2003, an O'Fallon police department officer, Lieutenant Eric VanHook, along with Officer John Spanley, approached the defendant on the parking lot of his place of work, the Western Illinois Correctional Center, to ask if they could speak with him about a case. The defendant said that he would need to first speak with his attorney. The officers had a warrant to search the defendant's vehicle, although that fact was not immediately disclosed to the defendant. The officers did not read the defendant his constitutional rights pursuant to *Miranda v. Arizona* while on the parking lot. After speaking with his attorney, the defendant and the officers got into a vehicle and began traveling to the Mt. Sterling police department for the interview. Along the way, the defendant's attorney called and asked if the location of the interview could be changed from the police department to his law office. The officers agreed. During this ride, the defendant was not handcuffed and sat in the front seat. An officer drove the vehicle, and two other officers rode in the backseat. The defendant was not questioned during this commute. He was allowed two stops to use a restroom, and an officer purchased the defendant a soda to drink. Upon arrival at the defendant's attorney's office, the defendant and his attorney had a private conversation. Thereafter, the defendant requested immunity in exchange for agreeing to give the statement. Although the immunity request was denied, the defendant ultimately agreed to give a statement to the police, so long as the statement was recorded and done in the presence of his attorney. *Miranda* rights were read to the defendant before he gave his statement. The defendant acknowledged his understanding of those rights. The defendant's recorded statement lasted approximately 50 minutes. The officers offered the defendant a ride back home, but he declined that offer. During the

defendant's interview, the police executed the search warrant for the defendant's vehicle.

*Stipulation Regarding the Defendant's Truck Search.* At trial, the parties stipulated that nothing of evidentiary value was found during the search of the defendant's truck on December 17, 2003.

*The Defendant's Taped December 17, 2003, Interview.* The defendant prefaced his interview with a statement to the effect that he had wanted to contact the police before this interview in order to tell them what he knew, but he had not done so due to advice he received from his wife and his father-in-law. During the videotaped statement, the defendant acknowledged that he was in the O'Fallon store on the date that the victim was murdered. On that date, the defendant traveled to the area to go to an auto parts swap show in Collinsville. However, he never found the show and ended up in the Fairview Heights/O'Fallon area. He traveled back onto eastbound Interstate 64 intending to go home but realized that he was going in the wrong direction. He exited the interstate in O'Fallon. He saw the dance store and thought that he could stop in there and purchase a black leotard for his daughter. He went into the store, made a purchase, and returned to the interstate. After several minutes, he began having second thoughts about his purchase—concern that the leotard would not fit. Because he did not live in that area, he would not likely be back to return or exchange the leotard. He then turned around and returned to O'Fallon with the intent of returning the item.

Upon parking his truck on the parking lot, he saw a young man in what he described as a track suit walk from the dance store towards his truck. He assumed that the man was going to talk to him, but instead, the man quickly passed by his truck. The defendant entered the store. He did not see the employee. He found some blood near a clothing rack, and out of concern for the employee, he began calling out to her and looking throughout the store. Upon entering a room in the store, he discovered her body. The defendant stated that when he found her body that there was nothing distinctive about the way in which the employee was dressed. He acknowledged touching her thigh and checking her body for a pulse. He determined that she was deceased. Fearing for his own safety, he fled the store and the O'Fallon area. He claimed that he did not know what to do. He did not have a mobile phone.

When he got home, he told his wife what happened, and the two of them tried to determine what he should do with this information. The defendant's father-in-law also was told about his experiences, and his

father-in-law advised him to stay out the situation—essentially to say nothing.

The defendant testified about various threats that were made by Dawn relative to their pending divorce. The divorce had become combative, as the defendant stated that he had proof that Dawn committed child abuse. Dawn left him telephone messages advising him that if he did not act in a nicer manner towards her that she would have to go to the law enforcement authorities to tell them what the defendant knew about the murder and had not disclosed. Dawn allegedly told him that she would be contacting the O'Fallon police. The defendant stated that he had not spoken to any other members of law enforcement about the events of December 31, 1999, until this interview.

*Emily Hea Buss's Videotaped Deposition Testimony.* During her deposition, Emily explained her medical condition. Emily was due soon to give birth, and she did not feel safe traveling to St. Clair County to testify at the trial. She was previously married to Joe Hea, with whom she had two children. They were neighbors of the defendant and Dawn for some time. The Heas moved away to a different home in Mt. Sterling in 2002. In 2003, she was aware that Dawn and the defendant were going through a divorce. The defendant stored some of his personal belongs in their home at this time.

Sometime in August 2003, the defendant spoke to Emily in her garage about the events of December 31, 1999. He prefaced his story to Emily as one that would "freak [her] out." He told her that he had been in O'Fallon and had stopped to buy his daughter a leotard at a dance store. He returned to the dance store after deciding that the leotard may not fit his daughter, but upon his return, he could not find the store clerk. He waited a considerable length of time and ultimately decided to look for the clerk. He saw blood on the floor in an area by the cash register. The defendant searched through the store, ultimately finding the girl's body. He got scared and fled the scene. He had blood on his clothing and hands. He went to a convenience store where he washed his hands and threw away the leotard. He drove home and lied to Dawn about the source of blood on his clothing, telling her that he struck an animal with his car. He also told Emily that he believed Dawn planned to blackmail him about his failure to go to the police.

Emily testified that she asked him what he planned to do about what he had witnessed and told him that he should talk to someone and clear his name.

The next day, Emily searched the Internet without success for information about the murder.

Later in October 2003, just before Emily and her husband were to testify on his behalf at hearings about his divorce, the defendant told her that he had an appointment to meet with O'Fallon police and his attorney. On October 10, 2003, right after Emily and her husband Joe testified for the defendant, he told them that the night before he and his attorney met with O'Fallon police officers in his attorney's office and that he had been cleared. Having no reason to doubt this statement, Emily did not contact the police.

After this conversation, but before December 15, 2003, something happened that changed the nature of their friendship with the defendant. Emily testified that after the divorce hearing, some things the defendant told them did not match up with certain events. As a result, she and Joe determined that his items needed to be removed from their home. Emily stated that they quietly severed ties with the defendant. When pressed, Emily testified that she "disagreed with how he handled some things."

On December 15, 2003, the police contacted her. Ultimately, Emily gave four interviews to the O'Fallon police about these conversations. Upon cross-examination, Emily admitted that she had conversed with her then-husband Joe about the situation, but never about any substantive fact of the defendant's story. Instead, she characterized her conversations with her husband as being in the realm of shock that someone they knew had been involved in this type of situation.

*Joseph Hea.* Joseph Hea, the defendant's former neighbor and friend, and the ex-husband of Emily Buss, testified at trial. Sometime in 2000, he and the defendant had a conversation in which the defendant told Joseph that he had met a girl named Amy who looked a lot like Joseph's then wife, Emily. In August 2003, the defendant called Joseph and asked to meet him at a bar. The defendant told his story of purchasing the leotard on December 31, 1999, and then deciding to return the leotard and finding the store clerk dead. Joseph testified that the defendant traveled to O'Fallon for a swap meet but earlier had told police in an interview that he thought that the swap meet was a gun swap meet. The defendant explained to Joseph that upon determining that the dance store employee was dead, he panicked and fled the scene. The defendant told him that he went to a convenience store to wash his hands in order to get the blood off of his hands and arms. The defendant threw the bag containing the dance leotard in the convenience store trash can. The defendant told Joseph that at some point after fleeing the dance store crime scene, he threw a gun that he was

24

carrying that day out the window of the truck. He got rid of the gun because he was in this state of panic.

At some point during this conversation in the bar, the topic of the weapon and the caliber of the weapon came up. The defendant stated that the weapon was a "throw-away" one. Joseph asked the defendant if it was a .45–caliber gun, and the defendant said that it was. The defendant told Joseph that the caliber of the gun he threw away on his way home matched the caliber of the gun used by Amy's murderer.

The defendant told Joseph that he drove home and told his wife that he had hit an animal resulting in the blood on his clothing.

The defendant told Joseph that Dawn was "blackmailing" him in the course of their divorce proceedings with the knowledge that the defendant had not gone to the authorities with the information he had.

Joseph testified that at this bar, after the defendant told his story, Joseph advised him to go to the authorities to tell them what he saw. Joseph testified that approximately one week later, the defendant told him that he and his attorney had gone down to St. Clair County to file a report. The defendant told Joseph that the authorities were not terribly interested in the information he had about the crime.

Thereafter, the defendant and Joseph had a falling out in which Joseph and his wife Emily distanced themselves from the defendant relative to allegations apparently made by the defendant to third parties that Emily was having an extramarital affair.

Sometime in December 2003, Joseph had a conversation with Dawn about what he knew of the defendant's involvement at the O'Fallon crime scene. Dawn told Joseph that she was going to let the authorities know that the defendant also told Joseph about what happened. Approximately three days later, Joseph was contacted by the police on December 15, 2003, to inquire about the conversations he had with the defendant about the O'Fallon crime. By the time of the interviews, Joseph was no longer friendly with the defendant.

Joseph testified that the defendant and Dawn were both into guns—that buying and shooting guns was their hobby.

*John Hackman.* John Hackman, Emily Buss's father, also testified at the trial. He resides in Jacksonville. He met the defendant in 1999 when Emily and

her husband Joe became neighbors with him. As time passed, he became friendly with the defendant due to shared interests. When the defendant was diagnosed with cancer, John drove him numerous times down to the St. Peters, Missouri, location of Barnes Hospital for chemotherapy. He also accompanied the defendant on a trip to Wisconsin to obtain a drag racing engine.

In the fall of 2003, when the defendant and Dawn began the divorce process, the defendant began spending more time with John—frequently spending nights with John in his home. During one of these visits, the defendant told him about the O'Fallon crime scene he encountered. During this conversation, the defendant told John that he was fearful that Dawn was going to tell the authorities what she knew.

The defendant told John that he went down to the area on December 31, 1999, to go a swap meet gun show. Unable to find the swap meet, he ended up in a store at which he purchased an article of clothing for one of his daughters. He told John that he decided to return the item and upon arrival back at the store saw a man running out of the store wearing a coat and a stocking cap. He discovered the store clerk's body in the store. The defendant told John that he rolled the girl's body over in order to check for a pulse. He told John that the girl had been shot in the head. The defendant fled the scene. He told John that the reason he ran was because he had an unregistered handgun with him, and he was afraid to be caught with it. Somewhere on the way home from O'Fallon, he got rid of the gun. When he got home, he told Dawn that he hit a deer. When she began to try to get the stain out of the pants and noticed that there was more blood there than what she would have expected, Dawn was able to get the defendant to tell her the full story.

John testified that for two to four weeks, he tried to get the defendant to contact police. Finally in October 2003, when John and the defendant were at a race track, the defendant told John that he and his attorney had an appointment with O'Fallon detectives. The day after the alleged meeting, John contacted the defendant to find out how it went. The defendant told him that the meeting was fine and that the detectives advised him that he was uninvolved in the case.

Eventually that fall of 2003, the friendship between John and the defendant began to wane. After the divorce, John went to Dawn's home to apologize to Dawn for taking the defendant's side during the divorce proceedings. The topic turned to the events of December 31, 1999. While at Dawn's home, Dawn told John what the defendant had told her about his involvement in

the case. Dawn told John that the defendant bought the gun that he threw away at a swap meet. The defendant allegedly told Dawn that he took the gun with him to the swap meet because he was carrying $300 in cash.

Ultimately, the police interviewed John in December 2003 and again in January 2004 due to technical difficulties with the recording in December 2003.

In John's testimony, he stated that while he spoke with Dawn about the defendant's story prior to the police interview, nothing that he would have told the police officers changed because the stories that the defendant told him and told Dawn matched. John acknowledged reading newspaper articles about the crime. John also acknowledged that he and his daughter Emily and son-in-law Joseph talked about the defendant from time to time, but not exclusively about this case because there were many things going on with the defendant at the time.

*James Ritchey.* James Ritchey is Dawn Ritchey's father. He testified that his daughter had been married to the defendant for approximately 10 years. He socialized with the defendant during his daughter's marriage. He confirmed that the defendant and his daughter both enjoyed owning and using guns. He testified that the defendant bought his daughter an inexpensive .38–caliber pistol and that the defendant possibly had another .38–caliber gun as well.

In early January 2000, the defendant and Dawn came to speak with him in his home in Macomb. The defendant proceeded to tell the story of what he witnessed on December 31, 1999. The defendant told James that the victim had been shot in the head. James Ritchey denied ever telling the defendant to stay out of the case or to not get involved. To the contrary, James told the defendant that he needed to get in contact with the O'Fallon police detectives to tell them what he saw. He also confirmed that his daughter Dawn did not ever, in his presence, tell the defendant to stay out of the matter and/or to tell no one of what he witnessed.

At some point in the fall of 2003, after the divorce process had begun, O'Fallon detectives were in contact with him. At their request, he did participate in a taped phone call to the defendant in an effort to get his acknowledgment that he did at one time buy Dawn a .38–caliber handgun. The defendant denied doing so and told James that he bought her a .22–caliber gun.

James denied ever reading newspaper articles about the crime.

27

*Dawn Ritchey.* Dawn Ritchey testified that she married the defendant in 1993, and two daughters were born during the marriage. The children were five and three in December 1999. Dawn has been employed with the Illinois Department of Corrections throughout her career. Currently, Dawn is a parole agent. Prior to that, she was a correctional counselor within the Western Illinois Correctional Center. The defendant was a maintenance equipment operator for the Department of Corrections and drove a truck delivering meat to all of the State's prisons. Dawn testified that both she and the defendant were firearms enthusiasts.

On the morning of December 31, 1999, the defendant left the home wearing a dark brown leather bomber jacket she gave to him that Christmas as a present. He was also carrying a small black triangular-shaped case in which they kept a small gun—a .38–caliber. Dawn explained that she knew that the defendant was carrying the .38 that date because it was the only gun that they owned that would fit into that case. Dawn testified that the defendant bought the gun for her. Her understanding was that the gun was purchased at a gun show in 1996 or 1997.

Later that night, the defendant came home at somewhere between 5 and 6:30 p.m. Dawn testified that the defendant came in and walked straight upstairs. He was not wearing his leather bomber jacket. She noticed that there was something on his jeans from the knees on down. She described the substance as being more than a mere splatter but less than being soaked. Dawn testified that she asked the defendant what that was on his pants. The defendant told her that it was blood from an animal that he had to drag off of the road. Later, Dawn saw the pants again—in the trash can in their bathroom.

That night, the defendant had to work because it was the New Year's Eve of the year 2000, and officials were concerned that there could be Y2K outages, necessitating the delivery of things to the prisons within the system. He got home at around 2 a.m.

The next day, the defendant slept in. Dawn described this as unusual as the defendant always got up early in the morning. At around 1 p.m., she carried lunch into the bedroom for the defendant. Dawn stated that she could tell that there was something wrong, and she asked the defendant. The defendant proceeded to tell his story. He told Dawn that he had witnessed something that really bothered him and that he could not get the images out of his mind when he tried to sleep. He told Dawn that he had intended to go to the gun show on December 31, 1999, but that he was unable to locate

the show. He returned to a convenience store where he had seen the flyer with the plans of rereading the flyer, only to discover that the flyer was now gone. As he returned to his car, he saw a dance clothing store and decided to go over to purchase an outfit for their daughter. Dawn testified that this would have been unusual because Dawn bought not only all dance apparel for their daughter, but she purchased all clothing for both daughters. She could not recall any instance where the defendant bought clothing for their daughters. Shortly after the purchase, the defendant returned to the store with the intention of returning the outfit. He then encountered a man running from the store. This man had a duffel bag and was wearing a track suit. The defendant told Dawn that he thought that the man was coming straight towards him, and so the defendant reached for the gun that he had with him. However, when the defendant looked up, the man was gone. The defendant then entered the store with the outfit. He saw no one. He called out but got no response. The defendant told Dawn that he saw blood behind the counter and followed a trail that led to a back room in the store where he found the girl's body. The defendant knelt down to check the girl's pulse in her neck. He explained to Dawn that this is how he got blood on his pants. He told Dawn that the girl's pants were pulled down. Dawn was unable to remember if the defendant told her that the pants were pulled down to her knees or to her ankles. The defendant told Dawn that upon determining that the girl was dead, he got scared and left the store, stating that he feared that he had left prints on the door.

A couple of days later, she and the defendant went to Quincy to look in newspapers to see if there was a description of the man the defendant said he saw leaving the store. Dawn recalled that in a St. Louis Post–Dispatch article (that she believed was dated sometime between January 1 through January 4, 2000), the police investigators were looking for a sixfoot-tall blond man.

Shortly after looking in the newspapers, Dawn and the defendant went to her dad's home. The defendant told her dad the same story, also explaining that the reason he did not call anyone was because he was afraid that they would think that he committed the crime. Dawn testified that her dad told the defendant that he should call the police anyway. Dawn also encouraged the defendant to do so, telling the defendant that at a minimum he should call the CrimeStoppers hotline with his tip. Her dad never told the defendant to stay out of the case. Dawn testified that she never told the defendant to stay out of the case. Dawn testified that she continued to encourage his reporting, but due to life circumstances in their own home, Dawn testified that, sadly, she somewhat forgot about the murder.

In 2002, the defendant was diagnosed with colon cancer. He had surgery and six to eight months of chemotherapy. Dawn testified that they all focused on the defendant's recovery.

Dawn testified that she never thought that the defendant was lying to her or that he was in any way involved in the murder of Amy.

At the end of July in 2003, the defendant accused Dawn of having an affair with a man in the area where they lived. She moved out of the home, taking the two girls with her, and filed for divorce. Dawn described the divorce process as not amicable. Dawn acknowledged that after the defendant began an attempt to obtain sole custody of their daughters, she called him and left a voicemail to the effect that if he continued to do these things, she would have no choice but to tell the court about the crime he failed to report. The morning after she left this voicemail, Dawn was visited at work by the defendant and his mother to discuss the divorce.

A prison employee who worked with Dawn and whom Dawn had told about her husband's story located the St. Clair County sheriff's department website and read the information about the unsolved crime. Dawn's friend felt that what she read was important and asked Dawn to look at the information. On the website, there were two composite drawings. Dawn agreed with her coworker that one of the drawings, coupled with the description of the man that the O'Fallon police were looking for, matched the defendant. Her friend advised that if Dawn would not call the police, then she would. Dawn then went to see her divorce attorney and told him the full story. Prior to that time, she had only told her attorney that she had information that the defendant failed to report a crime. Dawn had not previously told her attorney the specifics of the incident. Her attorney called the O'Fallon police department on September 19, 2003.
On September 20, 2003, Officer Spanley drove to the home of Dawn's divorce attorney to interview her. Dawn testified that she, the attorney, and the officer did not discuss the facts of the case before she gave her recorded statement.

The court entered a dissolution of the Phillips' marriage on December 15, 2003, reserving all decisions relative to child custody, visitation, and property distribution.

On December 17, 2003, the police returned to Mt. Sterling and stopped at her home to ask if they could search the premises. Dawn signed a consent for the search and then showed the officers around. One of the places that the officers searched was in the attic. Dawn testified that while the parties

30

were by then divorced, not all of the defendant's things had been removed
from the home. She testified that the attic space had essentially been
divided with her things on one side and the defendant's things on the other
side. The officers searched through the defendant's items and located a
cardboard box for a .38–caliber handgun. Dawn testified that she did not
remember ever seeing this box before. On cross-examination, she explained
that the .38–caliber handgun was a gift from the defendant to her, and when
he gave it to her, it was not in a cardboard box.

Dawn testified that the .38–caliber gun was never registered.

She claimed that when she left that phone message for the defendant that
she was not attempting to get the upper hand in the divorce proceedings.
At trial, the defendant's attorneys played Dawn a tape-recorded message
that they contended was her threat to the defendant. Dawn testified that
she really did not believe that this was her voice on the tape. The voice did
not sound like her voice, and the speaker on the tape used words in the
message that Dawn would never use.

Dawn testified that the defendant had visitation with his children until he
was arrested on December 16, 2003. Ultimately, she was awarded custody
of their two girls and was awarded the house in the property settlement.

Dawn testified that she and the defendant had been down in the metro-east
area of St. Louis several times before December 31, 1999.

When asked why she never called the police herself after she learned what
the defendant witnessed, she testified that she believed her husband.
However, Dawn testified that after looking online at the composite drawing
and accompanying description, coupled with the defendant's behavior
after she filed for divorce, she felt compelled to provide the information that
she had.

Dawn acknowledged that someone told her that there was a $20,000 reward
for information about Amy's murder, but this person also reminded Dawn
that as employees of the Department of Corrections, they were ineligible for
an award.

*Doris Lehne.* The defendant's mother, Doris Lehne, testified at trial. She was
a tax accountant and had lived in Mt. Sterling, Illinois, since 1964. She
testified that the defendant had worn facial hair—a moustache and
goatee—from approximately 1997 through 2003. After the divorce
proceedings began, she suggested to the defendant that he shave his facial

hair because he was going to be making court appearances. Doris testified that the defendant and Dawn had many mutual hobbies, including guns. She testified that the defendant was unaware that Dawn was going to leave him and got home on that particular day to find that most of her personal possessions had been removed. She described the marriage as a good one up until that point, and she testified that the defendant adored his two daughters.

*Vehicle Sightings Testimony at Trial.* All of the witnesses provided information about vehicles that they saw in the vicinity of the store and/or on the parking lot of the store on December 31, 1999.

David Delano testified that he saw a 1980s Dodge Chrysler vehicle driving at a high rate of speed at 4:25 p.m.

Paul Levins testified that at 4 p.m., and later at 4:50 p.m., he saw three vehicles on the parking lot—a dark maroon sedan, a 1970s muscle car, and a third vehicle that he could not remember.

Janet Channel testified that between 5:10 and 5:20 p.m., a 1950s or 1960s dark-colored vehicle with rust on it cut her off as she was driving on Highway 50 near the store.

Lisa Krius testified that between 3 and 5 p.m., she saw a black Chevrolet Cavalier, a white car, and a pickup truck on the parking lot.

Victoria Dickerson testified that between 3:30 and 4 p.m., she saw an older, boxy gray car drive away from the area. At about the same time she saw a man standing on the parking lot.

Marilyn Cox testified that at about 4:15 p.m. and at 5:15 p.m., she saw an old, rusted car on the parking lot. She believed that the car was an old 1960s powder blue Thunderbird.

A stipulation was read that James Miller would testify that between 6:30 and 6:45 p.m., he saw a black Chevy S–10 pickup truck parked on the parking lot.

*Other Possible Suspects Presented in the Defendant's Case at Trial.*

A man by the name of Thomas Boger testified that on December 31, 1999, at around 1:30 p.m., a car drove up behind him flashing its lights and driving erratically. Thomas stopped. The driver—a young white male with

blond hair—wanted directions to the Sports Authority store in Fairview Heights. Later at about 3 p.m., he saw the same man in his car on the parking lot of the Sports Authority, and he had a revolver in his hands.

Officer Spanley was with the O'Fallon police department at the time of this crime and during its investigation. He testified to the various leads and suspects received by law enforcement agencies about this crime.

They obtained fingerprints from many different people, including Amy's boyfriend, Jody Woods. When the detectives from the major case squad arrived at the apartment where Jody lived, he was found hiding in a closet. Jody drives a Chevy S–10 pickup truck.

A man by the name of John Sprous was seriously considered as a suspect. The information leading to John Sprous was overheard by a fellow inmate of Sprous who wanted a transfer to another jail. This inmate is John Little. John Little and his cellmate were in fact transferred to the prison of choice. Officer Spanley's investigation revealed that John Sprous was out on parole on December 31, 1999. At the time that he became a suspect, he was in prison in Missouri for robbing and killing a store clerk. They cross-checked his fingerprints against what was recovered at the scene and there were no matches. Officer Spanley confirmed that all St. Louis media, which heavily covered this murder and the investigation, was carried into the Potosi, Missouri, correctional facility where John Little was then housed. Although there were five other inmates involved in the conversation overheard by John Little through an air vent, none of these five inmates were interviewed.

John Little testified at trial that he was serving a life sentence in Missouri. Little heard the conversation on January 19, 2002. Little testified that the men were looking at a magazine and that Sprous allegedly stated that the photo of a woman in the magazine looked like a girl he had killed in Illinois. Sprous allegedly claimed that he got off the interstate and went to a service station. He saw the victim through the window of a store. His alleged plan was to rape the woman, but then because he saw a taxi cab or a police car out the front door of the store, he determined that it was necessary to kill the woman. He allegedly claimed to have moved her body to another area of the store before returning to St. Louis.

*Defense Expert, Brent Turvey.* Brent Turvey is a forensic scientist and criminal profiler. He is an adjunct professor of criminality at Oklahoma City University. He was asked to review materials related to this case. He reviewed an FBI profile prepared in this case, the crime scene and autopsy photographs, the crime scene video, crime scene sketches, several crime

scene reports, the coroner's report, the O'Fallon police department investigative reports and evidence logs, the St. Louis Major Case Squad investigative reports, and the Illinois State Police forensic reports and evidence logs that involved biology, firearms, and latent prints. He prepared a written report for the defense dated December 6, 2006, based upon his review of these documents along with his expertise.

In his review, he found several deficiencies in the processing of the crime scene. He testified to what he characterized as a very limited effort on the part of the investigators to document, collect, or search for evidence outside of the building. No attempt to determine the point of entry or exit from the building was done. He took issue with the fact that a police vehicle was parked by the front door of the store. By parking the official vehicle there, Brent Turvey testified that critical evidence could have been contaminated or destroyed. He testified that the police vehicle could have been parked on top of evidence that could have pointed to the criminal offender's point(s) of entry and exit. On the subject of entry to and exit from the store, Brent Turvey testified that the investigation did not seem to include a search for bloodstains or blood trails outside of the store. He felt that the police should have processed Amy's vehicle for any sort of evidence relative to the crime. Brent Turvey also testified that the police investigation was deficient because there was no attempt to locate the high-velocity bloodstain pattern typically associated with a gunshot wound, which could provide detail as to exactly where Amy was when she was shot.

Brent Turvey rendered additional opinions at trial about the evidence in addition to those detailed opinions as to deficiencies in the processing of the crime scene. Although Amy's body sustained bruising consistent with a struggle, he felt that she was not in a lengthy struggle because her fingernails were not broken. He also testified to his opinion that the crime scene was staged to look like a sexual assault. He defined staging as something a criminal offender might do to mislead the investigation by altering the crime scene in order to make it appear to be something other than what occurred. He further explained this by testifying that Amy's body was dragged into the bathroom, and her legs were spread apart, but the evidence failed to support any effort on the part of the offender to attain sexual gratification. He testified that had any sexual activity transpired, blood would have been transferred to the genital area. As there was no blood in that area of her body, Brent Turvey testified that in his opinion, the crime scene was staged to look like a sexual assault. On cross-examination, he admitted that he could not rule out a sexual motivation for the crime in this case.

*See Phillips*, 2011 IL App (5th) 070416-U, ¶¶ 7-96 (cleaned up) (Emphasis in original.);

*accord Phillips*, 2022 IL App (5th) 180348-U, ¶¶ 6-125; (Docs. 1, pgs. 8-20; 13, pgs. 7-11).

By way of a reminder, Petitioner briefly suggests his February 21, 2013, affidavit

from the Illinois postconviction proceedings qualifies as new evidence, stating as follows:

> Additional new evidence is presented in the fact section in Ground One, in the form of [Petitioner]'s own affidavit in support of his post-conviction petition…. In that affidavit, [Petitioner] directly asserts his actual innocence. In a new trial, [Petitioner] could elect to testify and directly refute the testimony of Dawn and other witnesses.

(Docs. 13, pg. 10; 13-3).

However, "obviously self-serving," " 'eleventh hour' affidavits, containing facts

not alleged at trial and accompanied by no reasonable explanation for the delay[,] are

inherently suspect" and do not meet the evidentiary bar for an actual innocence gateway

claim. *See McDowell v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013); *see also Jeffries v. Adkins*,

No. 21-cv-3637, 2024 WL 1363633, *15 (N.D. Ill. March 29, 2024) (finding the petitioner's

"self-executed affidavit" fell short of that evidentiary bar where he "sw[ore] that he did

not commit the crime and that he was merely driving his car near the scene, smoking

marijuana, and then fled from police because he did not have the money to bail himself

out of jail"). Therefore, to the extent Petitioner now seeks to rely on his affidavit, the Court

finds that evidence is insufficient to support an actual innocence gateway claim under

the above-discussed authorities. *See Patterson*, 124 F.4th at 1046; *Dixon*, 93 F.4th at 403.

Further, Petitioner identifies an "additional recording of a voice mail message by

[Petitioner's ex-wife] to [Petitioner] that was made and recorded after the one played at

trial." (Doc. 13, pgs. 7-9) (Emphasis in original omitted.). Notably, the recordings were

35

made by Petitioner, in mid-to-late-2003, with a cassette tape. *See Phillips*, 2022 IL App (5th) 180348-U, ¶¶ 186-88; (Docs. 1, pgs. 10, 23-24; 10, pg. 5; 13, pgs. 7-10). Petitioner stored the cassette tape in his truck until it was seized, pursuant to a search warrant, in December 2003. *See Phillips*, 2022 IL App (5th) 180348-U, ¶ 188; (Doc. 1, pgs. 23-24). Therefore, the additional recording is new in the sense that it was not presented at trial, but it was evidence about which Petitioner knew before the trial and the time that the judgment of conviction became final, as Respondent suggests. (Docs. 1, pgs. 5-6, 10, 22-23; 10, pg. 5; 13, pgs. 7-10). As stated above, an unexplained delay in presenting this evidence to a court, though not a bar to his actual innocence gateway claim, would tend to undermine the credibility of Petitioner's claim. *See Gladney*, 799 F.3d at 898.

To provide the necessary context, the Court describes each of the recordings related to Petitioner's argument in these proceedings. The first recording, which was played at Petitioner's trial, contained the following message from Dawn to Petitioner:

> Ed, I just wanted to ask you if you had any input on this before I make a call. I thought I was going to call Jim Stover of the O'Fallon Police Department about an unsolved murder. I just wondered if you had any thoughts on that before I made the Call. I'll talk to you later. Bye.

*Phillips*, 2022 IL App (5th) 180348-U, ¶ 187; (Docs. 1, pg. 22; 13, pg. 9).

Petitioner left Dawn the following voicemail in response to the above message:

> Hi, Dawn. I just wondered if you had any input on this and I just wanted to check with you first in case I decided to make a call. I made a little trip to talk to some people and I decided to make a statement, and these nice people assured me that there is absolutely nothing to be concerned about. In fact, someone mentioned a term called attempted blackmail. This would be a good time to stop playing games and treat each other like we at least used to love each other. So, I guess it is back to the bargaining table since I want the home and 50-50 visitation and you will have custody and I will

help you get a place if you treat me like you know you should. I just wanted to get your input first in case I decided to make a call. I guess I'll talk to you later.

*Phillips*, 2022 IL App (5th) 180348-U, ¶ 187; (Doc. 1, pg. 22).

The additional recording, which was not played at trial and is now identified as new evidence, contained the following responsive message from Dawn to Petitioner:

Hi, Ed. It's Dawn. I just got your last message. Okay. I guess it won't be blackmail because I'm gonna call Captain Jim Stover tomorrow at the O'Fallon Police Department and I guess we'll just do this. I can't understand why you won't be nice and I guess it is what I will have to do. Well, I will talk to you later. Bye.

*Phillips*, 2022 IL App (5th) 180348-U, ¶ 187; (Doc. 1, pgs. 22-23).

Petitioner argues, if the additional recording was played at trial, it "would have completely undermined Dawn's testimony—including her denial that it was her voice on the first voice-mail recording, her claim that she had only threatened to tell the divorce court, and not the police, about [him] being at the scene of the murder, and her evasion of the question as to whether she had sought to blackmail [Petitioner]." (Doc. 13, pg. 10). Petitioner argues the additional recording "would have exposed her as someone willing to lie in order to convict" Petitioner. (Doc. 13, pg. 10) (Emphasis in original omitted.).

Like Petitioner's February 21, 2013, affidavit, the additional recording is not the type of evidence that typically allows a petitioner to prevail on an actual innocence gateway claim. In other words, the additional recording is unlike the type of reliable evidence described by the Seventh Circuit, *i.e.*, exculpatory scientific or biological (DNA) evidence, trustworthy eyewitness accounts, or other critical physical or documentary evidence. *See Patterson*, 124 F.4th at 1046-47; *Dixon*, 93 F.4th at 403.

In any event, though, even when viewing the additional recording in the light requested by Petitioner, the Court cannot conclude that evidence proves it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. *See Patterson*, 124 F.4th at 1046; *Dixon*, 93 F.4th at 403; (Doc. 13, pgs. 7-10). That is, even assuming the additional recording undermines Dawn's testimony or amplifies her alleged credibility issues, as discussed above, Petitioner cannot satisfy the demanding standard for an actual innocence gateway claim in light of all the other available evidence of record. In reaching this conclusion, the Court stresses that it cannot make independent factual determinations about what occurred in this case, as it is only tasked with assessing the likely impact of the evidence on reasonable jurors. *See Blackmon*, 823 F.3d at 1102.

When doing so, the Court recognizes Petitioner's theory is that Dawn sought an upper hand in their divorce proceedings when reporting her knowledge of the murder. However, it remains the case that Dawn, by choosing to make that report years after the murder, potentially subjected herself to criminal liability for not making an earlier report. *See Phillips*, 2011 IL App (5th) 070416-U, ¶ 246. Further, regardless of whether she intended to make a report to the divorce court or to the police, or whether the second recording was more threatening than the first recording, the record shows Dawn accused Petitioner of failing to report the murder but not of committing the murder. *See id.* ¶ 247; *Phillips*, 2022 IL App (5th) 180348-U, ¶ 192. Indeed, the record indicates Dawn initially believed Petitioner's version of events. And, importantly, Petitioner admits, "[o]n cross-examination, [Dawn] admitted telling police that her voice-mail message…was 'threatening' because he was seeking custody of their children." (Doc. 1, pgs. 14-16, 24).

38

Also, Petitioner told a largely consistent version of events to James Ritchey, Joseph Hea, Emily Hea Buss, and John Hackman, including, *inter alia*, that he: (1) was at the scene of the crime interacting with Amy immediately before her murder; (2) found, and then touched, Amy's dead body; (3) had blood on his clothing; (4) fled the store without reporting the crime to law enforcement; (5) destroyed the evidence, including the leotard, his clothing, and his firearm, that tied him to the scene of the murder; (6) found Amy with a gunshot wound to the head, despite the fact that the police investigators and the forensic pathologist could not determine a cause of death by looking at Amy; and (7) indicated he met with, and was subsequently cleared by, police detectives, when that was not true. *See Phillips*, 2011 IL App (5th) 070416-U, ¶¶ 247-250; *Phillips*, 2022 IL App (5th) 180348-U, ¶ 192. Therefore, even when setting Dawn's testimony aside, the Court agrees with the Illinois Appellate Court, Fifth District, that "[i]t defies logic that every one of these witnesses, all of whom relay[ed] essentially the same story, ha[d] motivations to falsify evidence and to harm" Petitioner. *See Phillips*, 2011 IL App (5th) 070416-U, ¶ 247.

Petitioner's interview with the police was also played for the jury at trial, which indicated he could remember "precise details" about some things, such as seeing a man exiting the store before he found Amy's body and subsequently deciding to touch Amy's body to determine if she was still alive, but not other things, such as whether Amy's clothes were removed. *See id*. ¶ 252. Finally, the jury heard that, while Petitioner denied owning a .38 caliber firearm, John Toumbs sold such a firearm to Petitioner in 1992 and was able to identify the "blue Bryco Arms box" that was found in the attic of the Phillips' marital home. *See id*. ¶¶ 25, 253. Based on this evidentiary record, which would still allow

39

a reasonable juror to find beyond a reasonable doubt that Petitioner's actions were inconsistent with innocence, Petitioner cannot prove a gateway claim of actual innocence.

### III. CONCLUSION

As stated above, the Motion to Dismiss is **GRANTED.** The case is **DISMISSED with prejudice**. The Clerk of the Court is **DIRECTED** to enter judgment accordingly.

Since Petitioner is a state prisoner, he does not enjoy an absolute right to appeal. *See Buck v. Davis*, 580 U.S. 100, 115 (2017). He must obtain a certificate of appealability, which may issue only if Petitioner made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(1)(A), (2); *see also* Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts. Petitioner must show "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed." *Buck*, 580 U.S. at 115. If a petition is dismissed on procedural grounds, without consideration of the merits, then the petitioner must show jurists of reason would find it debatable whether he or she stated a valid claim for the denial of a constitutional right *and* that the Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *accord Peterson v. Douma*, 751 F.3d 524, 530-31 (2014).

Here, the Petition was filed after the time prescribed by the one-year limitations period and Petitioner has not shown he is entitled to either an equitable tolling or to proceed through the actual innocence gateway. The Court **FINDS** jurists of reason would not disagree with this conclusion. Therefore, a certificate of appealability is **DENIED.**

**SO ORDERED.**

Dated: February 7, 2025

s/ *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge